**AMERICAN LIFESTYLE HOMES, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 115–88C.**

United States Claims Court.

Aug. 8, 1989.

Michael J. McAvoy, Fenton, Mo., for plaintiff.

Hillary A. Stern, Washington, D.C., with whom was Acting Asst. Atty. Gen. Stuart E. Schiffer, for defendant.

### ORDER

FUTEY, Judge.

This matter is before the court on defendant's motion to dismiss for lack of subject matter jurisdiction pursuant to RUSCC 12(b)(1). The action arises out of the efforts of the United States Environmental Protection Agency to decontaminate Quail Run Mobile Home Park in Franklin County, Missouri. Plaintiff originally brought this

action in the United States District Court for the Eastern District of Missouri, under the Federal Torts Claims Act, 28 U.S.C. § 2671 *et seq.* (1982). Plaintiff filed motions in that court to amend the complaint to allege a breach of contract and for transfer to this court. The district court subsequently issued an opinion transferring the case to the United States Claims Court. For the reasons discussed, the court retransfers this case to the United States District Court for the Eastern District of Missouri.

### Factual Background

In the early 1970's the road access to the Quail Run Mobile Home Park (Quail Run) in Franklin County, Missouri, was sprayed for dust control with waste oil containing dioxin. As a result, land and personal property within the park, including mobile homes, became contaminated with dioxins. The Environmental Protection Agency (EPA) discovered this contamination in late 1982 and early 1983. In March of 1983, the Center for Disease Control (CDC) issued public health advisories noting that the extensive contamination of the area represented a hazard to the residents, and recommending relocation of residents from the area in order to ameliorate the problem. In February of 1985, the EPA ordered all residents to leave Quail Run in order to decontaminate their property. As part of the decontamination, CDC issued guidelines for cleaning the mobile homes.

The actions taken to decontaminate the area were effectuated under authority of the Comprehensive Environmental Response Compensation and Liability Act (CERCLA), codified at 42 U.S.C. § 9601 *et seq.* (1982), which provides for, *inter alia,* the President to "remove or arrange for removal of, and provide for remedial action relating to ..." hazardous substances, pollutants and contaminants which pose a substantial threat to the environment. 42 U.S.C. § 9603. The Act established the "Hazardous Substance Response Trust Fund" to provide monies "in connection with releases or threats of releases of hazardous substances into the environment" in accordance with the provisions of the Act. 42 U.S.C. § 9631 (later amended by the Superfund Amendments and Reauthorization Act of 1986, Pub.L. No. 99–499, 100 Stat. 1696 (1986), which incorporated the "Hazardous Substance Response Trust Fund" into the "Hazardous Substances Superfund"). The government allocated $3,431,750 from this fund for the cleanup effort at Quail Run.

Plaintiff, American Lifestyle Homes, Inc. (American Lifestyle), a Missouri corporation involved in mobile home sales, is the owner of a mobile home which was decontaminated pursuant to the Quail Run cleanup.[1] On May 20, 1985, plaintiff and the EPA entered into an "Agreement to Allow Entry to Premises for Environmental Response Actions," in order to effectuate the decontamination of the unit. This document authorized the EPA to enter the home and perform "decontamination and related activities." It provided that the "activities authorized under this agreement are expected to be completed on or before six months from the date access has been granted...." In accordance with the agreement, the decontamination should have been completed on or before November 20, 1985, since cleanup activities were commenced on May 23, 1985. The agreement specifically stated that "EPA's liability for damages to the property or injuries to persons which result from or are caused by the activities on the property shall be to the extent permitted by the Federal Tort Claims Act and the Federal Employees Compensation Act (28 U.S.C. Sec. 2671 *et seq.*, 5 U.S.C. Sec. 8108, *et seq.*, and 31 U.S.C. Sec. 240, *et seq.*)."

The EPA drafted procedures for the decontamination of the trailers at Quail Run which provided for cleaning to be performed both on-site and off-site. The EPA contracted with Riedel Environmental Services Company (Riedel) to perform the cleanup operations, which in turn subcon-

---

1. Prior to March 22, 1985, the mobile home at issue was occupied by Tim McKinney who had purchased the unit from American Lifestyle subject to a lien. McKinney vacated the unit when on-site activities were initiated and subsequently forfeited the home to American Lifestyle.

tracted the cleaning, rehabilitation, and transportation of the contaminated mobile homes to Facilities Engineering Corporation (FEC).

On June 4, 1985, while the mobile home was in transport, the unit sustained damages to the tires and exterior paneling due to driver error. By letter dated July 16, 1985, the Director of the Environmental Services Division of the EPA, advised plaintiff that the mobile home was cleaned in accordance with the CDC criteria, and that delivery would be made on July 18, 1985. In a letter dated July 17, 1985, FEC advised the EPA Region VII Technical Assistance Team that the unit was being shipped that day even though one of the rooms in the unit had a carpet problem which would be corrected when it arrived in St. Louis. The mobile home arrived on July 19, 1985, whereupon plaintiff was notified by letter from FEC of the opportunity to inspect the unit. After inspecting the home, plaintiff refused to accept the unit, stating problems with its marketability due to unmatching exterior paneling, the furnace not being fastened down, and a broken storm window.

Except for two exterior panels, all repairs of the unit were completed by August 14, 1985. FEC ordered new panels from the manufacturer on November 20, 1985. Shortly after delivery of the panels on January 6, 1986, repairs were completed.[2] On January 13, 1986, the EPA contacted plaintiff to arrange a delivery date. American Lifestyle stated that it no longer wanted the unit, and planned instead to file suit against the EPA for untimely delivery.

On January 30, 1986, plaintiff filed an administrative claim against defendant pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671, *et seq.* (1982), seeking damages in the amount of $22,000. The claim alleged that the EPA had "failed and refused" to deliver the unit, thereby effectuating a wrongful conversion of plaintiff's mobile home. This was denied by letter dated October 22, 1986, which stated that the claim was primarily for breach of contract rather than negligence, therefore it was not actionable under the FTCA.

By letter of September 29, 1986, the EPA again advised American Lifestyle that the unit was cleaned, and requested an address where the home should be delivered in order for plaintiff to take possession. The letter further stated that all trailers removed from Quail Run were to be returned to the site for storage. American Lifestyle responded on October 30, 1986, by letter, requesting that the unit be delivered to plaintiff's facility. The correspondence also stated that American Lifestyle intended to sell the unit at the best possible price and then bring suit against the EPA in district court to recoup its loss. However, prior to the delivery date, plaintiff advised the EPA that American Lifestyle had changed its position and would not take delivery of the unit.

Having exhausted all available administrative remedies, plaintiff brought suit in the United States District Court for the Eastern District of Missouri on November 26, 1986, pursuant to the FTCA. The complaint alleged that defendant had wrongfully converted the mobile home due to its failure to deliver the property. On December 23, 1987, the government filed a motion to dismiss, or alternatively, for summary judgment asserting that the district court lacked subject matter jurisdiction because the claim involved a contract in excess of $10,000, accordingly, under the Tucker Act, 28 U.S.C. § 1491 (1982), the action belonged in the United States Claims Court. On February 12, 1987, defendant additionally filed a counterclaim against plaintiff requesting $19,200 in damages, plus interest, alleging that the EPA had attempted to return the unit, however, plaintiff had refused to accept possession. The counterclaim also requested an additional $1,200 per month, beginning January 5, 1987, until the date of judgment, for the costs to store and guard the unit.

**2.** Defendant contends that repairs were delayed, in part, due to confusion as to which party would supply the panels.

On January 26, 1988, plaintiff filed a motion seeking leave to file a first amended complaint to allege a breach of contract by the EPA. Additionally, plaintiff filed a motion requesting transfer to the Claims Court under 28 U.S.C. § 1631 (1982).

The district court issued a Memorandum and Order on February 12, 1988, which held that, "while [American Lifestyle's] petition nominally charges the EPA with wrongful conversion of plaintiff's mobile home, this Court finds that plaintiff's cause of action is for breach of contract," thus plaintiff's cause of action does not fall under the FTCA. The court also concluded that it could not assert jurisdiction over the matter under 28 U.S.C. 1346(b) (1982), because the amount of the contract was over $10,000. Determining that plaintiff could have a cause of action in the Claims Court, and that it could "ascertain no benefit to plaintiff, defendant or the judicial system which would be derived from denying transfer and dismissing this action thereby requiring the parties to start anew in the prosecution of this suit," the district court transferred this case on February 12, 1988, pursuant to 28 U.S.C. § 1631.[3] The district court stated, however, that its transfer did not serve to confer jurisdiction upon the Claims Court, citing *Diamond v. United States*, 228 Ct.Cl. 493, 498, 657 F.2d 1194, 1197 (1981), *cert. denied*, 459 U.S. 831, 103 S.Ct. 70, 74 L.Ed.2d 69 (1982). Consequently, the court held all pending motions in abeyance and transferred the matter to the Claims Court. The district court therefore never acted on plaintiff's motion to amend its complaint.

Plaintiff filed a complaint in this court on March 31, 1988, under 28 U.S.C. § 1491 (1982), alleging a breach of contract.[4] Defendant filed a motion to dismiss on June 21, 1988, pursuant to RUSCC 12(b)(1) asserting that this court lacks subject matter jurisdiction because, *inter alia*, claims arising under CERCLA may only be brought in the district court.

### Discussion

CERCLA authorizes the President to take action to remove environmental hazards caused by the release of "hazardous substances" as defined under the Act. 42 U.S.C. § 9604(a)(1) states:

Whenever (A) any hazardous substance is released or there is a substantial threat of such a release into the environment, or (B) there is a release or substantial threat of release into the environment of any pollutant or contaminant which may present an imminent and substantial danger to the public health or welfare, the President is authorized to act, consistent with the national contingency plan, to remove or arrange for the removal of, and provide for remedial action relating to such hazardous substance, pollutant, or contaminant at any time ... or take any other response measure consistent with the national contingency plan which the President deems necessary to protect the public health or welfare or the environment, unless the President determines that such removal and remedial action will be done properly by the owner or operator of the vessel or facility from which the release or threat of release emanates, or by any other responsible party.

This authority has been delegated, through executive order, to the EPA. *See* Exec. Order No. 12316, 46 Fed.Reg. 42237 (1981), Exec. Order No. 12418, 48 Fed.Reg. 20891 (1983), and Exec. Order No. 12580, 52 Fed. Reg. 2923 (1987).

■ In accordance with the provisions of CERCLA, the EPA acted to rid the Quail Run site and mobile homes located therein of dioxin contamination. The damage to plaintiff's mobile home arose as a direct result of the remedial action taken by the

---

**3.** Section 1631 provides, in pertinent part, that when the court finds that there is a want of jurisdiction the court "shall, if it is in the interest of justice, transfer such action over to any other such court in which the action ... could have been brought at the time it was filed...."

**4.** Instead of seeking to amend the complaint as transferred by the district court, plaintiff filed a complaint in the Claims Court alleging a breach of contract.

EPA in pursuit of this objective.[5] Furthermore, any delay in delivery of the unit was proximately caused by such actions. Hence, any and all damages which plaintiff may have incurred were the result of EPA actions taken in accordance with the procedures established under CERCLA.

■ It is the "practice of courts generally to refuse to reopen what has been decided...." *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, —, 108 S.Ct. 2166, 2178, 100 L.Ed.2d 811 (1988) (citing *Messinger v. Anderson,* 225 U.S. 436, 444, 32 S.Ct. 739, 740, 56 L.Ed. 1152 (1912)). This principle, called the "law-of-the-case doctrine" provides that, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case...." *Christianson,* 486 U.S. at —, 108 S.Ct. at 2177 (citing *Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983)). Thus, under normal circumstances the law of the case doctrine would require this court to refrain from deciding the issue of jurisdiction contrary to the finding of the district court. However, this court is obligated to determine its own jurisdiction. *See Hambsch v. United States,* 857 F.2d 763 (Fed.Cir.1988), cert. denied, — U.S. —, 109 S.Ct. 1969, 104 L.Ed.2d 437 (1989).

■ "[T]he United States, as sovereign, is immune from suit save as it consents to be sued ... and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1975) (citing *United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 769, 85 L.Ed. 1058 (1941)).

The United States has waived its immunity as to claims arising under CERCLA only to the extent that such actions are maintained in the district court. In pertinent part CERCLA provides, *"the United States district courts shall have exclusive original jurisdiction over all controversies arising under this Act...."* 42 U.S.C. § 9613(b) (emphasis added). This jurisdictional limit must be strictly construed. Thus this court is prevented from asserting jurisdiction over matters arising under CERCLA which allows suit to be brought only in district court.[6] *See generally Transamerican Nat. Gas Corp. v. United States Dept. of Interior,* 816 F.2d 689 (Em.App.1987); *Tipperary Refining Co. v. United States,* 11 Cl.Ct. 572 (1987). Consequently, although plaintiff might otherwise assert jurisdiction under the Tucker Act, 28 U.S.C. § 1491, the Claims Court cannot hear claims arising under CERCLA. This court is therefore without jurisdiction over the present claim.[7]

■ A "court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance, although as a rule courts should be loathe to do so in the absence of *extraordinary circumstances* such as where the initial decision was 'clearly erroneous' and would work a *manifest injustice." Christianson,* 486 U.S. at —, 108 S.Ct. at 2177 (citing *Arizona,* 460 U.S. at 618, 103 S.Ct. at 1391) (emphasis added). As discussed, this court finds that the language of CERCLA vests exclusive jurisdiction over this matter in the district court. Thus it would work a manifest injustice if the decision of the United States District Court for the Eastern District of Missouri as to jurisdiction was not revisited. Adhering to the district court's decision would force dismissal of the complaint,

---

5. 42 U.S.C. § 9601(24) provides:
   "remedy" or "remedial action" means those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment....

6. The district court did not address this jurisdictional limitation in its Memorandum and Order of February 12, 1988.

7. Moreover, the agreement between plaintiff and the EPA does not evidence the existence of consideration which is necessary to support a binding contract. *See Metzger, Shadyac & Schwarz v. United States,* 12 Cl.Ct. 602, 605 (1987); Restatement (Second) of Contracts §§ 75–81 (1981); 1 S. Williston, A Treatise on the Law of Contracts §§ 99–103 (3d ed. 1957).

leaving plaintiff without a forum to litigate the present claim through no fault of its own.

The Federal Circuit has recently decided two cases concerning retransfer. In *Doko Farms v. United States,* 861 F.2d 255 (Fed. Cir.1988), the court favored strict adherence to law of the case principles and concluded that any revisit of a jurisdictional determination should be exceedingly limited. The court admonished against "[j]urisdictional ping pong" created when the question of jurisdiction is determined by the transferee court contrary to that of the transferor court. *Id.* at 257. However, in *Rodriguez v. United States,* 862 F.2d 1558 (Fed.Cir.1988), the Federal Circuit stated that although "a transfer order should not be reviewed by the transferee court where such review would undermine the benefits of the 'law of the case' rule, there is no per se rule against return of a transferred case by the transferee court." *Id.* at 1560 (citing *Christianson,* 486 U.S. at ——, 108 S.Ct. at 2177). Additionally, the Claims Court is obligated to retransfer a case where a district court's decision to transfer is "clearly erroneous" *Rodriguez,* 862 F.2d at 1560. Furthermore, the Court of Claims held in *Clark v. United States,* 229 Ct.Cl. 570, 576–77 (1981) that where jurisdiction was lacking in the Claims Court, retransfer to the district court rather than dismissal was in the interest of justice.

This court finds that review of the district court's determination of jurisdiction would not undermine the benefits of the law of the case doctrine. *See Christianson,* 486 U.S. at ——, 108 S.Ct. at 2177; *Rodriguez,* 862 F.2d at 1560. Jurisdiction clearly does not lie in this court. Consequently, revisiting the district court's decision regarding jurisdiction is not inharmonious with the Federal Circuit's holding in *Doko Farms.*

Although neither party has moved for a transfer, counsel for both defendant and plaintiff stated during a telephone conference held by this court on April 25, 1989, that they had no objections to this case being retransferred. Finding that jurisdiction may lie in the district court, this court

determines retransfer to be appropriate. *See A & S Council Oil Co. v. United States,* 16 Cl.Ct. 743 (1989).

### Conclusion

Finding that the Claims Court lacks jurisdiction over this matter, the Clerk is hereby ordered to retransfer this case pursuant to 28 U.S.C. § 1631 to the United States District Court for the Eastern District of Missouri. Defendant's motion to dismiss is therefore moot.